Simmons v. Miller.

---

DAVID SIMMONS *v.* J. H. MILLER, Enrolling Officer.

1. STATE TROOPS: ACTS OF LEGISLATURE IN REFERENCE TO, CONSTRUED.—The acts of the legislature, of January, 1862, January, 1863, and December, 1864, in reference to the raising of State troops, were not intended to authorize the State to retain those of her citizens in her service who were liable to service under the Conscription Act of the Confederate Congress of 17th February, 1864, when their services were required by the Confederate Government.

2. CONFEDERATE TROOPS "TO SERVE DURING THE WAR": ACT OF CONFEDERATE CONGRESS OF FEBRUARY 17, 1864, IN REFERENCE TO, CONSTRUED.—Citizens liable to service by the act of the Confederate Congress of February 17, 1864, could not be relieved therefrom, when their services should be demanded by the Confederate Government, by being in the military service of the State prior to the call of the President, or by their actual enrollment in the State troops after the call.

3. CONGRESS AND THE STATES: POWER OF, AND EXERCISE OF CONCURRENT POWERS. —Where the constitution grants to Congress and the States power over the same subject and the same persons, the powers are concurrent only to a certain extent. The power of the States is subordinate to that of the General Govern-

ment; and the exercise of it by the latter precludes its exercise by the former. If the State had exercised the power before its exercise by the General Government, it ceases to the State, and the power of the General Government becomes paramount.

4. CONGRESS AND THE STATES : GRANT OF POWER TO.—Where the nature of a power or the terms in which it is granted require that it should be exclusively exercised by Congress, the States are prohibited from its exercise as fully as if they had been expressly forbidden to act upon it.

5. CONGRESS : WAR POWER OF.—The war power of Congress must, from its nature in case of a public war, be exclusive ; and the States have no right to withhold from the General Government any of her citizens required for the service of the government, even though the State may want them to repel invasion or suppress insurrection.

6. CONCURRENT POWERS IN COURTS OF JUSTICE NOT SIMILAR TO CONCURRENT POWERS OF CONGRESS AND THE STATES.—Where courts of justice have concurrent jurisdiction, the one which first takes jurisdiction retains it to the exclusion of the others.   Where Congress and the States have concurrent powers over the same subject, the exercise of the power by the State does not prevent its exercise by Congress.   Upon the exercise of the power by Congress, the right of the State to exercise it ceases.

ON *habeas corpus.*   Error to judgment of Chief Justice Handy.

David Simmons, a white man, and at the date of the passage of the act of the Confederate Congress, between the age of forty-five and fifty years, was a citizen and resident of the county of Hinds, and State of Mississippi.   That notice to persons between the ages of forty-five and fifty, to appear at the city of Jackson for enrollment in the Confederate service, was duly published in March, 1864.

· On the 20th of April, 1864, David Simmons was appointed deputy sheriff of Hinds county, under the proclamation of the Governor of the 2d April, 1864, requiring an additional number of deputy sheriffs to be appointed as a police force.   The sheriff of Hinds county, under this proclamation of the Governor, appointed fifty additional deputies.

On the 26th of April, 1864, Simmons reported to the enrolling officer at Jackson, Miss., and was registered " as by occupation a deputy sheriff."   After this registry, Simmons volunteered in Capt. Ban's company of volunteer State troops, organized under the act of the legislature of 9th December, 1863.

Simmons' office as deputy sheriff expired in August, 1864,

Simmons *v.* Miller.

the legislature having passed an act on the 13th of August, 1864, restricting the number of deputy sheriffs.

In January, 1865, Simmons, at the time a member of Capt. Ban's company of State troops, was arrested by Capt. J. H. Miller, enrolling officer, and held by him as subject to Confederate service. Simmons sued out a writ of *habeas corpus*, was tried, and being remanded to the custody of the enrolling officer, sued out this writ of error.

*Wm. Yerger*, *Thos. J. Wharton*, for David Simmons.

*W. P. Harris*, for Miller.

HANDY, C. J., delivered the opinion of the court.

The questions presented in this case are: 1st. Whether the acts of the legislature of this State authorized and required persons liable to service in the Confederate army, under the act of 17th February, 1864, or other acts of Congress, but who had not actually been placed in such service, to be placed in the State service.—2. Whether the State has the power to place her citizens in her military service before they are taken for Confederate service, and to the exclusion of the right of the Confederate States to their military service, when required by that government.

1. The question is, whether sections 4 and 5 of the act of 3rd January, 1863, are in conflict with the 7th section of the act of 9th December, 1863, and are repealed in virtue of the general repealing clause of section 30 of that act; and it appears evident that they are not.

The provisions of the two acts pertain to two distinct subjects. The purpose of section 4 was to declare that a certain class of persons then in the State service, but subject to Confederate service, or who should thereafter become so, should be discharged from State service; the purpose of section 7 was to prescribe generally what persons should be liable to State service. The act of January, 1863, was an amendment to the act of 24th January, 1862, the 4th section of which declared generally who

should be subject to State military duty in nearly the same terms as section 7 of the act of December, 1863. That general designation was not altered by the act of January, 1863; but section 4 of that act makes an exception to the general rule of liability prescribed by the previous act, by providing that persons then liable as conscripts for Confederate service, or who should thereafter be liable as such, should not be liable to State service. Section 7 of the act of December, 1863, again declares the general rule, but is silent as to the qualification stated in section 4 of the act of January, 1863.

It is clear by the 4th section of the act of January, 1863, that the legislature intended not to interfere with persons liable to the Confederate service as conscripts, by claiming their services in the militia, but that they should be surrendered to the service of the Confederacy; and that is a distinct subject from that embraced in the 7th section of the act of December, 1863, which simply was intended to prescribe the general rule as to what persons should be subject to State service. But this intention is more clearly manifested in section 5 of the act of January, 1863, which makes it the duty of State officers, civil and military, to arrest all absentees and deserters, and " all conscripts absent without leave, and to forward them to camps of instruction." Thus, the State establishes *a policy* not to interfere, for her own service, with persons liable to Confederate service, recognizing the right of the Confederacy to the service of her citizens, embraced in the acts of Congress, and affording her aid to that government in enforcing that right. The language of the act of December, 1863, section 7, so far from being inconsistent with this policy, clearly shows that it was intended to be observed; for it declares that " all free white males, etc., residing in this State, *including exempts and discharged soldiers from the Confederate service, and all who may have substitutes in the Confederate army,*" etc., shall be liable to military service under the act; which shows that all other persons subject to Confederate service were not intended to be included; for the express inclusion of one class is the exclusion of others.

There is nothing in the act of December, 1863, in conflict

with this policy of the act of January, 1863, or showing that it was intended to be changed; and the policy is so just and reasonable, and so important in its consequences, that it must be presumed, if the legislature had intended to change it, that it would not have been left to an indefinite repealing clause, which is often but matter of form, but would have been done so in positive terms.    All these acts are to be taken together, giving to each its appropriate force; and such a construction is to be adopted as will give effect to all their provisions, so that each may stand unless clearly repugnant to each other.

There is, therefore, nothing in our legislation to authorize the State authorities to retain the military services of her citizens who are liable to Confederate service under the conscript laws of Congress, when their services may be required by the Confederacy.

2. The 1st and 5th sections of the act of Congress of 17th February, 1864, entitled "an act to organize forces to serve during the war," render the persons therein designated, between the ages of 17 and 18, and 45 and 50 years, liable to military duty in the Confederate States service, *from the date of the act;* and such persons are bound to enroll themselves for such service at such times and places as the President should prescribe.   It is clear that under these provisions of law such persons were potentially in the service of the Confederate States from the date of the act, and subject to be called into actual service whenever the President should deem it proper to do so. And if this act of Congress be constitutional, as it is conceded to be, it appears to be manifest that a person subject to its operation could not be relieved from it, when he should be demanded for the Confederate service, by having been placed in the military service of the State prior to the call of the President, or to his actual enrollment after the call.

In opposition to this view, it is insisted that the power of Congress to raise armies, etc., is not exclusive of or paramount to that of the several States; that under paragraph 3, section 10, article 1, of the Constitution of the Confederate States, the several States have the power to "keep troops" in time of war, and to

Simmons *v.* Miller.

"engage in war" when "actually invaded, or in such imminent danger as will not admit of delay;" that these powers in the States are *concurrent* with those of Congress over the subject; and in the present case, that the State, having exercised the right to raise troops by bringing the petitioner and others into her military service, *before* they were actually in the service of the Confederate States, has a right to their services paramount to that of the Confederate States.

It is true that not only by the provisions of the constitution referred to, but by the general reserved powers of the States, they have the right to organize and maintain their militia within their territories. But the question is, whether a State can exercise this power after Congress has acted on the subject and called into service the same men who would constitute the State forces, so as to deprive Congress of its power over the subject; in other words, whether a power positively granted to Congress in the constitution may be exercised to the exclusion of a power over the same subject and the same persons reserved in certain cases to the States in the constitution.

The provisions of the Constitution of the United States upon this subject are nearly the same as those of ours; and, under that constitution, there is probably no question better settled than this.

The constitution, and "the laws made by the Confederate States in pursuance thereof," are declared by it to be the supreme law of the land. In many instances powers are granted to the Federal Government which may also be exercised by the several States in the absence of their exercise by the former. In such cases the powers of the several States and those of the Federal Government are said to be *concurrent*, and they are so to a certain extent. But the power of a State, in such cases, is subordinate to that of the Confederate States Government; and, whenever it is exercised by the latter, it excludes the power of the State over the subject-matter; and if it has been exercised by the State before its exercise by the Confederate States, it ceases to the State, and the power of the Confederate States becomes paramount over the subject. This

results necessarily from the constitution, and the laws made by the Confederate States in pursuance of it, being the supreme law; and, otherwise, the Federal Government would be deprived of the exercise of the power granted to it, or conflict and confusion would follow from the exercise of the same power by different jurisdictions and in different ways. Hence, it is held that such concurrent powers in the States are not independent and absolute, but subordinate powers, subject to be defeated or postponed whenever the Federal Government shall exercise the power granted to it in a manner incompatible with the legislation of the State upon the same subject. Per Washington, J., in *Houston* v. *Moore,* 4 Wheat.; *Ogden* v. *Sanders,* 12 Wheat.; 1 Kent's Comm. 389 (margin).

It is also well settled that " whenever the terms in which a power is granted to Congress, *or the nature of the power,* require that it shall be exercised exclusively by Congress, the subject is as completely taken from the State legislatures as if they had been expressly forbidden to act on it." C. J. Marshall, in *Sturges* v. *Crowninshield,* 4 Wheat. Mr. Hamilton states, as a case of exclusive power in Congress, " when the constitution grants an authority to the Union, to which a similar authority in the States would be absolutely and totally contradictory and repugnant." And he instances the power to establish a uniform rule of naturalization throughout the United States. See Federalist, No. 32.

These principles are applicable with peculiar force to the war-power of the Confederate Government. From the nature of the subject the war-power in Congress must be for the most part exclusive, in case of public war. Certainty and promptness in bringing forces into the field; the ability to command the entire military force of the country, if necessary, and whenever the exigencies of the war may demand; uniformity in their organization and regularity in their discipline are absolutely essential to the Government, in time of actual national war. The want of this power was severely felt in the war of the American Revolution, and was one of the reasons which led to the adoption of the Constitution of the United States, and gave rise to

the powers granted in that instrument " to raise and support armies," " to make rules for the government and regulation of the land and naval forces," and " to provide for organizing, arming, and disciplining the militia." See Federalist, No. 22. But the positions contended for in behalf of the petitioner would render these powers wholly inefficient in time of war, and throw the Confederate Government back to the inconveniences under the articles of confederation, by rendering it entirely dependent on the several States for troops to carry on the war, restoring the system for the most part of resorting to quotas of troops from the several States, and leaving it in their power to supply or refuse troops for carrying on the war, at their discretion. For, if the positions contended for be correct, and if each State has the right to withhold from Congress any portion of her citizens fit for military service and subject to it, she has equally the power to withhold *all* such persons whenever she may think fit to do so, for any reason of " keeping troops " in time of war in which the whole Confederacy is engaged, or of " engaging in war when actually invaded or in imminent danger " thereof; and the result might be that, when the Confederate States are engaged in a national war, that government would be wholly powerless to raise a single man within its limits to carry on the war, if the several States thought fit to retain their citizens in their service, and to enlist them all before they were called for by the Confederate States and the exigencies of the war.

It is plain that this is " absolutely and totally contradictory and repugnant " to the provisions of the constitution referred to, and would render the war-powers granted in the constitution nugatory. It would destroy all uniformity in raising troops, and all regularity in their discipline, since these things might depend upon the various regulations which each State might make. It would produce irregularity and injustice in obtaining troops, from the several States. It would, in effect, paralyze the war-power of the Confederate Government at the discretion of the States.

By the provisions of the constitution, the power to declare war belongs exclusively to the Confederate States Government;

and by its spirit, the carrying on of the war is committed to its especial control. It was never contemplated that the separate States should carry on the war within their limits after public war was declared, except to repel invasions; and that only so far as might be done without detriment to the general power of the Confederate Government, and consistently with the support which it is the high duty of each State to give to all the constitutional measures of that government for the prosecution of the war. And when the whole country is involved in a general war, it is a grave and dangerous error to suppose that any State has the right to engage in the war, or to institute measures of war, independently of the power of Congress and in opposition to the measures adopted by that body for carrying on the war, if they are constitutional.

Nor is the doctrine of *concurrent powers* in Courts of Justice applicable to the question here presented. Where two courts have concurrent jurisdiction of a subject-matter, the one which first takes jurisdiction of the case retains it to the end, because the jurisdiction of each is equal, and neither is superior to the other in any respect, so far as power over the subject is concerned. But this is a principle of jurisprudence which is not applicable to questions of political power between States, and especially is it not applicable to the relative powers of the States and the Confederacy under the constitution; for when the powers granted are exercised by that government, its action thereon becomes paramount and exclusive, whether the several States have acted on the subject or not. And this results from the fact that the laws made by Congress in pursuance of the constitution are supreme over the same powers existing in the States, and which might have been exercised by them in the absence of legislation on the subject by Congress. And this is the distinction between courts of equal and concurrent jurisdiction and the powers of Congress and the several States.

The powers here claimed for the State appear, therefore, to be wholly distinctive of the legislative powers of the Confederate States and entirely inadmissible.

It is unnecessary to consider the point of the petitioner being

exempt from Confederate service by reason of his being a deputy sheriff, since he was discharged from that office at the time he was actually enrolled and arrested by the Confederate officer as a conscript.

The judgment must be affirmed.